180 So. 473

**LOGAN v. THOLL OIL CO., Inc., et al.***

No. 34592.

Feb. 7, 1938.

---

* Rehearing granted on question of attorneys' fees subsequently dismissed April 11th, 1938, on motion of counsel.

Barksdale, Bullock, Warren, Clark & Van Hook, of Shreveport, for plaintiff and appellant.

W. M. Phillips, of Shreveport, for defendant Tholl Oil Co.

Blanchard, Goldstein, Walker & O'Quin, George Conger, and Robert Roberts, Jr., all of Shreveport, for defendant and appellee Arkansas Fuel Oil Co.

FOURNET, Justice.

This is a suit to cancel an oil and gas lease, and also for damages and attorney's fees.

The basis of the action is that the lease expired under the terms thereof, in that the leased property had ceased to produce oil in paying quantities, and the defendants (assignees of the lease) having refused to cancel the lease of record, plaintiff (lessor) is entitled to recover damages and attorney's fees.

The defense is that the property, having been fully developed in accordance with the terms and conditions of the lease, produced large quantities of oil for a long period of time, and although the production decreased due to the partial exhaustion of the oil reservoir underlying the property, nevertheless, the operations were profitable to both the lessor and the lessee and, therefore, in paying quantities within the meaning and terms of the lease.

The trial judge rejected plaintiff's demands and he has appealed.

The contract of lease was executed by the plaintiff to M. J. Henley on August 8, 1917, affecting forty acres in what is known as the Pine Island Oil Field in Caddo parish, and was thereafter acquired by the defendants, Tholl Oil Company, Inc., and Arkansas Fuel Oil Company, by mesne assignments. The latter oil company owned the lease rights below what is known as the "chalk rock strata" (approximately 1,700 feet below the surface), and the former company owned the lease rights to the depth of that strata, from which oil was being produced by it.

The record shows that during the first four years the leased property produced more than a half million dollars worth of

oil, and thereafter, from 1922 to 1936, the production was approximately $125,000. The value of the entire production during the year 1936 was $497.14, of which plaintiff received $62.15. During the three months immediately preceding the filing of this suit in the year 1937 the production was worth $149.55, of which plaintiff received $18.68. Therefore, during the fifteen months immediately preceding this suit, plaintiff received, as royalties under the lease, $80.83, or an average of $5.39 per month. During that time the leased property was being operated by one Miller, at his own cost, under a contract with the defendant Tholl Oil Company for 60 per cent. of the proceeds of seven-eighths of the oil produced. Under this arrangement, the defendant Tholl Oil Company received from him during the fifteen months $227.55, or an average of $15.17 per month net.

 "This court has repeatedly held that the main consideration of such a lease is the development of the land for oil and gas and that the lessee must either develop with reasonable diligence, or give up the lease.

"*A development that falls short of a reasonable production which would bring a net profit to the lessee and furnish an adequate consideration to the lessor for the continuance of the lease might well be said to be no development at all within the contemplation of the parties.*" Caldwell v. Alton Oil Co., 161 La. 139, 108 So. 314, 315. (Italics ours.) See, also, Green v. Standard Oil Co., 146 La. 935, 84 So. 211; Hunter v. Booker, 158 La. 690, 104 So. 618; Smith v. Sun Oil Company, Inc., 165 La. 907, 116 So. 379.

The question for our consideration, therefore, is: Was the production of oil in paying quantities within the meaning and terms of the contract of lease?

In the case of Caldwell v. Alton Oil Co., supra, the assignee of the lease owned several producing wells adjacent to the lease in controversy and was enabled to operate the well with little expense. The defendant was, therefore, able to derive a small profit from the small production, approximately five barrels per week, which it claimed constituted production of oil in paying quantities. In disposing of that issue, the court said: "It is not seriously disputed that, under ordinary conditions and as *an independent proposition,* a well producing only 5 barrels of oil a week is not a profitable investment and its operation would be abandoned." (Italics ours.) The court also stated that "under the defendant's own showing, assuming that $400 had been produced from the well in say 18 months, the amount coming to the lessor would have been $50, or say at the rate of $33.33⅓ per year. This amount admittedly would not be considered even a serious, let alone an adequate, consideration for the continuance of the lease. The original consideration paid for the lease was $500 for the first year."

 In the case at bar, the primary term of the lease was eight months from the date of its execution for which a consideration of $1,200 was paid, with the right of a four months' extension upon the payment of $800 additional, but its continuation depended upon whether "oil, gas or other minerals * * * be found in paying quantities,"

and, thereafter, *"as long as any one of said minerals can be produced in paying quantities."* (Italics ours.) Oil was discovered in paying quantities within the primary term of the lease, and seven other wells were drilled to the "chalk rock strata," a depth of approximately 1,700 feet, all of which were good producers and quite profitable to the lessor and lessee for a number of years. However, during the last few years, due to the practical exhaustion of the reservoir underlying the property, the production steadily declined—in fact, to such an extent that four wells were abandoned and the remaining four are small pumpers. The average production of these four wells during the fifteen months immediately preceding the filing of this suit was slightly over 1⅓ barrels per day, or ⅓ of a barrel each, which yielded plaintiff as royalty slightly over $5 per month. Can it be said that this is a serious consideration to give force and effect to the lease in controversy when the main consideration of the contract was production in paying quantities and when it is shown that the lessee had to pay the sum of $1,200 for the privilege of exploring for these minerals for a period of eight months, with the right to an extension for four months upon the payment of $800 additional? Our answer is "No," and we therefore conclude that the leased property had ceased to produce oil in paying quantities within the meaning and terms of the lease, and consequently had terminated at the time of the filing of the suit.

Plaintiff claims his right to damages and attorney's fees under the provisions of Act

No. 168 of 1920, section 2 of which reads as follows: "Be it further enacted, etc., that if any lessee, having been given written notice demanding cancellation of such lease, shall fail or refuse to supply the same within ten days *he shall be liable to lessor for a reasonable attorney's fees incurred by the lessor in bringing suit to have such forfeiture or cancellation adjudged, and in addition thereto shall be liable to the lessor for all damages suffered by the lessor by reason of his inability to make any lease on account of the first lease not having been cancelled."* (Italics ours.)

■ Plaintiff claimed $500 as attorney's fees for bringing the suit to have the cancellation of the lease adjudged in this case. Considering the issues involved, the value of the property, the work done as disclosed by the record, and the evidence adduced in support of the claim, we think that $500 is a reasonable fee for services rendered plaintiff by his attorneys in this case.

■ With reference to the claim for damages, a review of the evidence shows that O. G. Collins testified that he had offered to lease plaintiff's property on a commercial oil and gas lease for five years, for which he agreed to pay a hundred dollars an acre bonus, and $1 per acre a year rental, which plaintiff claims was accepted upon the condition that the lease in controversy be canceled. There is nothing in the record to show that plaintiff has suffered any damages other than the attorney's fees. It is possible that by the time this case shall have terminated, the property may be worth even more than the amount claimed here for damages.

For the reasons assigned, the judgment of the lower court is reversed and annulled, and it is now ordered, adjudged, and decreed that the lease executed by and between W. E. Logan and M. J. Henley on August 8, 1917, recorded in Conveyance Book 117, page 306, of the records of Caddo parish, La., be and it is hereby declared terminated and ordered canceled on the records of said parish; and that there be judgment in favor of plaintiff and against defendants for the sum of $500 for attorney's fees, with legal interest thereon from judicial demand, but rejecting plaintiff's claim for damages. All costs of this suit are to be paid by defendants.